Thank you, your honors, and good morning. May it please the court, my name is Adam Cans and I represent the Momox family and the administrator of the estate of M.M. Minor, the appellants and the plaintiffs in the underlying matter. We are here before you because a child needlessly died after being impoverished, essentially. His family was impoverished and they took this child and his other brothers and siblings out of the home. That's undisputed. We have put forth facts that the foster care home she was placed in was not properly licensed, not properly trained, and not properly supervised. And ultimately, because she was placed in this home, she died. There's no evidence that she would have died in her parent's home and the child died because the foster parents the county chose to put this infant in with were physically impaired, used narcotic medications, worked multiple jobs, were overwhelmed, and were not capable of caring for M.M. and the county knew it. Okay, so Mr. Gantz, while you're talking about the county, let's let's stop there for a moment, if you don't mind, for a question. Your first cause of action is against the county. Does your complaint specify a 1983 claim against the county based on a policy, essentially just a Monell claim, as opposed to the actions of their superior liability? So, can you flesh out what are the specific allegations, policy-based allegations, with respect to the county? Well, there is responding to superior when during the Monell analysis, whether or not the employees and the county acted with deliberate indifference as to the actions of the employees in carrying out certain... Well, it's a little different than that. I mean, they either have to have a policy or they have to adopt it or they have essentially ratified the conduct. What you're arguing, if I understand your argument, what you're arguing is if the employees displayed deliberate indifference, that means the county's liable. I don't think that's a correct statement of the law in that, you know, you have to show something else for the Monell liability. Well, again, this is based upon the actions of the employees not carrying out the policies and procedures that were in place of the county. There's also allegations that the policies of the county did not adequately protect this child while they were in... While she was in their custody. So, you're arguing that the policies were inadequate or negligent in some fashion. Are you arguing that the county... And if you're arguing this, the next question is going to be for you to identify these policies. What policies did the county have that essentially established a standard of deliberate indifference for the care in place for the foster children? Well, we established policies through an expert witness, Your Honor. We had identified an expert witness who was actually hired by the governor of Nevada in the mid 2000s to identify the problems within this foster care system, this specific foster care system in Clark County after a rash of deaths for kids that were in the foster care. And he identified several policies and procedures that were not adequate. And yet they had not changed a single policy or procedure since that time. And yet they continue to have those policies and adopted those policies. And then again, we're now dealing with, even with those policies in place, the employees that were involved in this particular action, there are facts to indicate that they did not follow their own policies in order to be able to be deliberate and different as to the rights of my client. Does that answer your question? Sort of. Is the expert you're Mr. Cooper? No, it's Mr. Cotton. Mr. Cotton. I'm sorry. Yes. Yes. Mr. Cotton and his, his expert report and his findings are in ER 572, I believe to 582. And he specifically identifies the Blue Ribbon Commission that was done back in the mid 2000s and talked about these policies and procedures that were never changed. And there's testimony from this case, as well as the individuals involved in this case and some of the policymakers that those policies had not changed since that period of time. And that's why we continue to have these problems with these cases and kids continue to die in the foster. So does Mr. Cotton specify policies or is it a general discussion? No, he talks about specific policies, for instance, in this particular case with these particular individuals, he's talking about the inadequate policies and follow up and supervising and training of their licensing individuals. For instance, I'm just giving you for instance, he has identified the policies and procedures within his report that have identified that the district judge didn't even look at that. And again, there was no oral argument at the time of this motion for summary judgment. And none of the facts that were looked at, including the report of this expert were taken into consideration when they made those those when he made the determination that that the matter should be dismissed in its entirety. And we can get to the specific factual findings to show that if we want to get past the Benell issue, which I think is outlined in his report in the specific policy, but I can talk about some of the factual stuff, which I think is the important part. At this particular stage, there were issues of dispute that were clearly raised by the plaintiffs. I'll give you an example. For instance, the Juarez has helped him with regards to the licensing of this particular home. And remember, my client, my client's child was was placed in this home just a month or so or two months after they got licensed. So this is a brand new license home and Juarez represented that neither of them had any conditions. But Mayra, the mom, the foster mom, acknowledged that Joaquin, the foster dad, had a serious back problem preventing him from walking. And it's important to note that the licensed worker, Ms. Akin, testified that she would never have licensed this home if she had known these facts. Yet, Ms. Juarez testified under oath that she actually told Ms. Akin about this in a car crash. And so is she. And they were both on medications. As a matter of fact, she testified under oath that she had to attach a second handwritten document, handwritten page to the licensing agreement, because there were so many medications that they didn't fit on the first page. In addition, when Ms. Akin went down to the home, she took a picture of all the medications that were in the drawer. Yet she says she had no idea that they were on medications and that they had problems with their medical condition. And yet that is a question of material fact that the judge just viewed completely in light of the county and said the county said they didn't know about this. So therefore they didn't know about this. You have to prove causation. How do you, between that and MM's death, how do you do that? Causation is clearly a question of fact for the jury. All we have to show is that there's evidence to show that. And the question is foreseeability of harm. And the whole point of why you don't license a home that has people who have physical conditions and medical conditions is because they can be overwhelmed. And yet they put a child with special needs into this home that's under two years old against their policy. And then they put our child into this home. A second child under two years of age into a home that was already a powder keg that was ready to explode. So causation is going to be a question for fact for the jury. And ultimately, the district court shouldn't be deciding that particular issue at this stage. We've raised facts to show that it's reasonably foreseeable that you license a home that shouldn't be licensed. And if they didn't put that kid into that home, she would have been killed, obviously, in this home. So there's what the causation issue is, Your Honor. And again, the whole crux of this appeal, Your Honor, is that we did not have an opportunity to present these facts to a jury that would be able to make the determination of whether or not it was foreseeable, whether or not the county's actions rise to that level. And clearly, this family was overwhelmed. And contrary to Apelli's argument, Mayra testified that she did report Joaquin's struggles to them, and that she specifically asked the Apelli Laniakin, who is the social worker and licensee worker, for child care needs. She asked for help. Does it change your analysis where it's undisputed that a doctor okayed both of them to serve as foster parents? So you can't look at this in a vacuum. You have to look at the whole process. And this is what our expert says. Our expert puts forth the reason. You can't just at one particular issue. The question is, when you're licensing a home like this, you have to look at the entirety of the circumstances. She went to a doctor. She told the doctor, I'm probably okay. She didn't specifically say, yeah, everything's fine. Oh, by the way, she also listed all the medications. We know that she was in a car wreck. We know her husband couldn't even carry and was struggling being able to carry the children around. He had two children there. And by the way, they never had kids before. So your question is specifically, yes, a doctor did say that. But ultimately, it doesn't stop right there. Because why do you send them to a doctor in the first place? Because you're concerned about their medical care. Just because the doctor says that, is that the end of your discussion? No, it's not. Because they have to go to the home. They see medications. They hear, if you take the evidence in favor of the plaintiff, that she has medical problems. They have concerns. They're expressing their overwhelmedness with the fact that they have these two kids. And the county did absolutely nothing to help. And one of the reasons is... I guess the difference is, I mean, it's a deliberate indifference standard. I see what you're saying. But I mean, how can you say that they're deliberately indifferent when a doctor cleared them to serve as foster parents, at least on the health issue? Sure. So the deliberate indifference comes in very, very succinctly. They have a photograph of pictures of medications. Don't ask about it. Don't ask whose they are. Don't ask what they're for. They have a testimony from the person saying, I told her we were in a crash. We're on narcotic pain medications in this home. And they do nothing about it. There needs to be more than just sending them to a doctor and saying, is this okay? The point is, that is the quintessential purpose of what the foster care social workers are for, is to ensure that they're in a home that is safe. And it's going to be an that relationship that they can. And again, we're not just talking about the medical care. We're talking about the fact that they're overwhelmed. They ask for resources. And she said, you know what? You don't qualify. Why don't you guys go pay for it yourself? Meanwhile, they're working two jobs. They're getting sleep deprived, and they still don't give them any resources. Neither one of them are working two jobs. Each one of them was working one job. And there was a person in the home at the time. That, it seems to me, is the record. Tell me, what do we do with this issue that they testified? There was testimony that this was the only shelter there was for this child that needed shelter. How does that fit into it? If you got to get a child into a shelter, and this is the only shelter that's available, how does that fit into our overall consideration of the case? First and foremost, with all due respect, and I have a great respect for you doing this a whole lot longer than I have, but the record from the defendants is that they only had one job, and there was always someone home. There's testimony from the actual foster mom that she was working two jobs. He was working two jobs. They were doing a paper route together in the middle of the night. And sometimes they would have to take the children and shuffle them at midnight in order to go back and forth between one job and another. There wasn't always someone that opportunity to be able to watch these kids, and that was the problem. So to answer your second question, what to do with them, there are other alternatives that you could have done to place this child. First of all, you could have actually left them in the home of the parents. That's what our expert witness proffered, by the way. He said they should not have been removed from this home because of the lack of resources that they had. That's the first thing. The second thing is, we actually identified, I think it was six or seven other foster homes that were available that could have taken this particular child. And then lastly, of course, you have Child Haven, the group facility that they could have put this child in. There were many other opportunities to do it, other than to put a child into a home that already has a child under two years old, and put this second child under two years old into a home that had never had children before, that had just recently been licensed, and that was screaming to them saying, hey, look, we're overwhelmed. There's a better alternative for this child, and this is not a good alternative. And by doing so, they were deliberately indifferent to her needs. I'm about at my two minutes, if your honors would want to ask another question, otherwise I'll reserve the remainder. All right, thank you. Ms. Galati. Yes, good morning. May it please the court, Felicia Galati, appearing for Clark County and the related employee defendants. Well, I think we will all agree that the facts of this case are very sad, but they don't change the law that has to be applied and the analysis that has to be applied, including deliberate indifference. Mr. Gans, I respect him very much, but he is referring a lot to what was presented to this court as a supplemental record under a motion for relief to supplement the record. That motion has not been ruled upon. Our position is that those 1,100 plus pages are not part of the record. They were not before Judge Gordon, and therefore they are not to be considered on appeal. A large part of what Mr. Gans has referred to is in that supplemental record, so this court cannot consider it. I'm going to do my best to go through each of the individual things that were raised by the justices, yourselves, and as well as Mr. Gans. Policies. They didn't identify any policies. There's nothing in the record. There are no exhibits. There's no argument regarding any policies. And the court is correct. There has to be, for a Monell liability, there has to be a policy customer practice. There's no evidence of that whatsoever. Also, Mr. Gans relies upon his expert. Well, they only made one argument regarding the expert. That was that falsification on an application is the basis for denial of a license. It doesn't mean you have to deny a license, but it is one argument. It's not fair to say that Judge Gordon did not consider the expert report. He did. He considered the expert report as it was presented to him. He's required to read each and every page and each and every word if they're not citing to it and not arguing it. And that's what happened in this case. Mr. Gans says that the expert opined about removal. He absolutely did not opine about removal. He opined about licensing and placement and supervision only, not removal. Furthermore, they did not dispute any of the evidence that was presented that the child was removed because she was left with her six siblings unsupervised, age two to twelve, on multiple occasions. Those are the facts with respect to the removal. Then Mr. Gans gets into the expert's discussion about reviews that have been done in Clark County. Again, not argued or presented before the court. Yes, the report was attached. That was years earlier. There's no evidence that that was still the case in 2014, which is when this case happened. The big argument that plaintiffs made, which was erroneous, was that the children were placed in the home, and we're talking about M.M. here, she was placed in the home before the parents were trained. She was not placed in the home before the parents were trained. And that's something the expert got wrong because they were not placed in the home before the parents were trained. So, Mr. Gans says that Mara said she was probably okay. She didn't say she was probably okay. The doctor said she was probably okay. Either way, the doctor was aware of the physical conditions having examined the foster parents and said they were okay. That's the end of the discussion. Yes, they indicated they had other issues. Yes, they indicated they had other medications. They never disclosed they were on. Mara said she had hydrocodone for pain or inflammation as needed. Joaquin never disclosed that he was on any hydrocodone medications. What do you make of Mr. Gans' statement that I think Mara told one of the employees about this medical issue? She absolutely did not, and we fully briefed that. She indicated that the struggle started happening the last week, the week that M.M. died. Her last contact with any DFS employee was September 17 and September 18. And what is she contacting them about? She wants to foster and adopt the other six kids. She not only wants the two kids that she has in her home. Now she wants six other kids. How does that indicate to the department that she is overwhelmed or that they can't handle it? In fact, they had already started weekend visits with some of the children. They were already having more than two kids in the home and visiting with them. How is that not a factual dispute then? If he's saying Mara told the employees and you're saying they didn't? No, he's saying that, but that's not in her testimony. She says she didn't remember. She was asked several times. Hold on a second, Ms. Galati. I'm going to ask the court and clerk to stop the clock, please. We lost Judge Wallace. I think we lost Judge Wallace. I don't see him on screen. Can we stop the clock, please? Kwame or Wayne? Yes, I'm here, Judge Beatty. Okay, so it looks like we lost Judge Wallace. Can you help us get him back? Yes, give us just one second, Judge Beatty. Okay, I've been out to McDonald's and I've come back now. I had to bring enough for everybody. Okay, so we just actually gave Ms. Galati... Oh no, there we go. Hold on just a second. Wayne's adjusting the clock and then I think it was at 8, so like 8.21 or so. There we go. There we go. Okay, Ms. Galati, now that we're all back, if you'd like to continue, we'll start the clock again. Thank you. I'm not sure where we lost Judge Wallace, but if there's any questions, just let me know. So I was talking about Merrill Warris. Mr. Gans said that she told Lenny Akin that they were struggling. Absolutely did not do that. In fact, we asked her specifically, did you tell the county that in reference to his physical condition? Her answer was, I don't remember. That's clearly in Judge Gordon's order a number of times. What Merrill wanted was some daycare. That was her decision. She wanted some daycare, but she never applied for the daycare. There was a childcare subsidy available. She never applied for it. Therefore, she didn't even seek the daycare help that she wanted. So this isn't a question of the county or its employees not providing the support. This is a question of the Warris making certain decisions. They decided not to apply for daycare. They decided not to tell the county these situations. They decided not to call and ask for respite care. They decided not to call and say, we can't take care of M.M. Please take her back. They decided Mr. Warris was going to give the medication as opposed to the foster mom who was a paraprofessional and had training with children and giving medication and testified that she could have been the one to give the medication, but they decided that Mr. Warris was going to do that. The way you're presenting this, it sounds like a factual dispute. Are you saying that the foster parents' decisions were not foreseeable, that there wasn't any link to anything that happened with respect to training, supervision, licensing of them while they had care of this child? I'm saying that the standard that has to be applied to the defendants is one of deliberate indifference, which is stringent and very high. So it requires not only its objective and subjective components. It requires not only that there's an objectively substantial risk of harm, but that the defendants were subjectively aware of facts from which an inference could be drawn of a substantial risk of serious harm. And they either actually drew that inference or a reasonable official would have done that. And a reasonable official would not have done that in this case because the defendants simply did not know. This was something that happened in the last week before M.M. died. The last contact, she died on October 12th. The last contact was September 17th and September 18th. The issue of causation was raised. That's certainly part of the Section 1983 analysis. The policy customer practice has to be a moving force behind the constitutional violation. And there's no evidence that what is before you was the case. But what about the policy? Wasn't there a policy in 2007? I guess it was a Clark County resolution that the county was committed to placing no more than one child under the age of two, except siblings in a foster home. And if DFS disregarded this resolution, isn't that evidence of deliberate indifference? And if it's not, why isn't it? It's absolutely not evidence of deliberate indifference. The county resolution that was an aspirational goal, it did say no more than one child under the age of two in a foster home. However, the relevant, applicable, and binding Nevada Administrative Code says no more than two. And in this case, there were no more than two. In other words, they filed the code, which is the law that they have to file. Not only did they file that, they also said that the county was committed to placing no more than one child under the age of two in a foster home. ...is that they appear to be a political subdivision department, which would mean they're not amenable to suit. But I didn't see the defendants argue that. Did they consent to being sued? DFS was dismissed from the action by stipulation earlier on because of that. DFS? Department of Family Services, yes. So the only defendants are Clark County and the individual named employees. Okay, thank you. All right, so looking at the deliberate indifference standard, it's a very high standard, as I've already mentioned, indicated that the aspects... that basically what this comes down to is that the plaintiffs failed to provide facts or law to support a finding of deliberate indifference. Sorry, hello? I can't hear you. Sorry, I lost you for a minute. My phone rang, my cell phone, which is linked to my iPads, but I can hear you now. I'm sorry, go ahead. Okay, so basically our position is that the Juarez's were appropriately licensed, that M.M. was appropriately placed in the home, and that she was appropriately supervised. And I'll break that down. With respect to the licensing, the Juarez's were trained, they had no prior abuse history, and there were no illegal bars to their being licensed. As a result, they were licensed. They had also had another child in their home. They'd had two, but one child, girl five, was there for one day, but... Counsel, I'm sorry, can I go back to the medical issue? I was just looking at the transcript with Myra, and it says that, you know, and they knew, speaking about the employees, they knew about this injuries from the crash, right? And she says, yes. And they knew about the narcotic pain medication, and she replies, yes. This is from ER 565. How does that not create a dispute of fact on whether or not employees knew? We've lost the judge. Okay, hold on again. I'm sorry. Everybody hold on a second. We've lost Judge Wallace again. So we'll just stop the clock, Wayne, and then let's get Kwame to see if we can get Judge Wallace back. Counsel, I apologize. This has just been an argument riddled with problems that we've never had before, but we will get through it. They didn't have my Diet Coke, and I went back to McDonald's and got the Diet Coke, and so we can start it again now. Wonderful. All right, try to stick around this time, Judge Wallace. Flying to San Francisco is getting more and more appealing. All I do is sit here, and the machine goes crazy. All right. We'll start again, and Judge Bumate, you want to go with your question? Yes. So I was referring to ER 565, and it noted that Myra said they knew about this, the injuries from the crash, right? And she said, yes. And they knew about the narcotic pain medication, and she replied, yes. So my question was, why does this not create a belief that employees knew about their medical issues? All right. So here's what I'll say. My belief is that she changed her testimony, but even accepting that that's what she said, she, I believe, testified that she told that to Lanny Aiken, who was responsible for licensing, not supervision. But even so, Lanny Aiken testified to the opposite. And even if you accept that there's a disputed fact, and you accept that that's the case, the question is, is the fact that someone is on pain medication a substantial risk of serious harm to MM? If we make that conclusion, that's going to apply to a lot of people, parents and foster parents. There's no evidence that that's the case, nor are there any case law that says if someone's on pain medication that that creates a substantial risk of serious harm. Even so, the only record, the only evidence in this record of the pain medication is Mr. Juarez's 2013 prescription model of medication. It was a 30-day dose, which if he used it should have expired long before MM was placed in the home. That's not evidence of consistent and substantial use of pain medication. I thought Mr. Gantz said that Aiken, Ms. Aiken testified that if she knew about medical issues, she would not have approved of the license or supervision. There are some things she didn't know about, and there are some things that she knew about. At this point, I don't have it in front of me, so I can't really specify. But even if she knew that there was pain medication, that doesn't create a substantial risk of serious harm to the child. And even so, if you look at the case law, for example, Henry A., or even the Chamis case, if you look at deliberate indifference and qualified immunity, you know, whether a reasonable official would draw certain inferences and or whether they would be entitled to qualified immunity, those cases deal with situations where there were known histories of abuse, prior histories of abuse, substantial complaints of abuse while the children were in the homes. I think in one case, there had been abuse for a period of 10 years. We have no prior abuse history. We have no complaints by anyone while any of the children are in the home, dating back to the first child, boy three, all the way up through M.M.'s tragic death. So you have no complaints. Parents have seen M.M. consistently while she's been in the home 15 times. No issues, no complaints, including twice after the last home visit. No medical incidents or episodes. So there is nothing that would create notice or knowledge on the part of the defendants of a substantial risk of serious harm to require them to do something. And even if you look at the fact that the last visit wasn't timely, which we can see, that did not cause M.M.'s death 25 days later when you have the parents seeing her twice after that with no issues regarding the child, no medical episodes, no medical records, no abuse complaints or anything like that. So even if you, and I think Judge Gordon did this. I think he pretty much accepted a number of facts and said, even assuming there were questions of fact, the defendants are still entitled to a qualified immunity. That was the analysis that he undertook and it's the appropriate analysis in this case. So we are over time because we've added time to the clock. It's okay. We've added some time to the clock and now we're about two minutes over. So unless Judge Bumate or Judge Wallace has any additional questions, we'll turn back to Mr. Ganz for his rebuttal. Thank you. Judge Bumate, you hit it right on the head. It's ER555, though I think you said 565, but 555 specifically asked Mayra, did you tell anybody about that? Yes, I told Lanny Atkins. So it literally says that. So did you also tell Lanny Atkins about Joaquin? And it says, yes, I was actually translating and I told her that. And then a little bit further down, another citation on ER558, it says, and you told the county about this, the concern that you had asked for some daycare. The answer was yes. Do you know who you told that? Lanny Atkins. And what was the response? We didn't qualify. It wasn't like, hey, let's go ahead and get you some help. It wasn't, we didn't qualify. And you'd also ask whether or not Atkins said she wouldn't have licensed this home. And you can look at our brief, our opening brief on page 24, Atkins specifically testified that she would never have licensed this home sitting here today. And they said, well, what's the difference? Well, I didn't know about the medications and I didn't know about the car crash that they had and the physical conditions. Yet we have testimony from Juarez saying that she told her about that. That is a question of fact and it needs to get to a jury. Well, counsel, how do you respond to the, to opposing counsel's statement that even if you assume those facts that Ms. Miro did tell the employees that that still doesn't meet the deliberate indifference standard? Okay, I'm either out or he's being very, very still. He's frozen. I haven't seen him move. So I think that's another problem. I'm sorry. It's getting painful. So call me or Wayne, can you hear us? I think Judge Wallace is frozen. Yeah, I can, I can see that. Thank you. We'll, we'll see what we can do. All right. All right. Poor Mr. Ganz is trying to finish up. And we will let you go over a little bit too to make up for the time and hopefully have no more technical problems. All right. Mr. Ganz, please. Yes. And I think the question can be very simply answered is that this, this house would never have been licensed. They violated their own policies. The policy that was put in place to protect children. You don't put a child in a home that is unsafe. And she said she would not have licensed this home. She would not have put in there that is deliberately indifferent for the substance of due process rights of my clients. So the other thing is too, with regards to the but she mentioned that, you know, they just missed a visit here or there. That is a policy that's been a problem with this, this agency for a long, long time since those Blue Ribbon reports, and there's deliberate indifference in the part of the county to supervise their, their employees to do that. Why would that matter in this case, if they had done their visits on time the first time, and the second time and the third time all within 30 days, they would have been there the week before. And they would be able to see whether or not Mr. Juarez was having problems says he was only having a problem the week before, which we don't contend. But again, it's a question of fact. We've raised enough to get beyond this stage of summary judgment. We didn't have a hearing in front of Judge Gordon. There's plenty in the record to show that there's questions of fact that need to be determined by a jury and we should be able to get to that. Thank you, Your Honors. All right. Thank you, counsel. The case is under submission. And again, thank you for your patience this morning as we work through our technical problems. And we are in recess for today. Thank you and be well all
judges: Wallace, Bade, Bumatay